# Henderson *et al.* v. Perryman *et al.*

*Bill in Equity by Creditors to set aside a Fraudulent Conveyance.*

1. *Conveyance by debtor in payment of debt; reservation of benefit; evidence.*—A sale by an insolvent debtor of property in payment of his debts can not be sustained if there is a reservation of a benefit to him; but the fact that the sale was made in part to pay a *bona fide* debt due from the insolvent debtor to his father, who was shown to be a man of fortune and liberal with his sons, and who, several months after the sale, organized a corporation and employed the debtor, his son, as its secretary and treasurer at a moderate salary, does not warrant the inference of a reservation of benefit to the debtor in the sale.

2. *Same; intent to defraud; legal effect.*—A sale by an insolvent

[Henderson *et al.* v. Perryman *et al.*]

debtor to a portion of his creditors of property materially greater in value than the amount of their debts is void as to the others; but the fact that the purchasing creditors took the property at a valuation materially greater than the amount of their debts, *when as a matter of fact* its value was not greater, does not invalidate the sale; since whatever may have been the intention of the parties, the legal effect of the transaction was such as the law permitted, whereby no legal injury resulted to the other creditors.

3. *Sale of partnership property in payment of debt of individual partner; validity as to partnership creditors.*—A sale of partnership property in payment of an individual debt of one of the partners is void as to the creditors of the partnership.

4. *Presumption of partnership; use of words "& Co."*—The use of the words "& Co." after the name of an individual raises the presumption of a partnership, which, unless rebutted by evidence, is conclusive.

5. *Same; same; case at bar.*—On a bill by creditors of P. & Co. to set aside a conveyance in the firm name as fraudulent, the following facts appeared: P., of the firm, testified that he was doing business as "P. & Co.," and that he had no partner. His testimony on other matters was evasive, self-contradictory and in conflict with many witnesses. Two disinterested witnesses testified that he told them that his brother and father were his partners. The brother had been in the same business in partnership with one T., and on closing that business the stock was put into P.'s store, and both T. and the brother entered that store. P. testified that his brother was a clerk, though T. was for a time a partner. T.'s share in the business was one-third. No agreement for salary was made with the brother, and no salary charged on the books, though he was charged with travelling expenses, and other clerks were charged with salary; his account being open in the same manner as P.'s. The brother, who was easily accessible, was not called, though P. was advised of the importance of the issue. *Held:* That a decree holding that P. had no partner, and that a transfer of property for his individual debt was, therefore, not in fraud of creditors of the business, should be set aside as against the weight of the evidence.

APPEAL from the Chancery Court of Jefferson.

Heard before the Hon. THOMAS COBBS.

The bill in this case was filed by the appellants, as creditors of W. E. Perryman & Co., against the appellees; and sought to set aside as fraudulent and void a conveyance by said firm of certain property. The facts of the case are sufficiently stated in the opinion.

Upon the final submission of the cause, on the pleadings and proof, the chancellor decreed that the complainants were not entitled to the relief prayed for, and

ordered the bill dismissed. From this decree the present appeal is prosecuted, and the rendition thereof is assigned as error.

CABANISS & WEAKLEY, for appellants.—1. The decree for the complainants should have been rendered upon the ground that the firm assets were employed to pay an alleged liability of W. E. Perryman, thereby defeating those creditors whose goods had gone into the business. Further, the consideration attempted to be proved in support of the deed is not the payment of money to the grantor, but the extinguishment of an indebtedness owing by him to the grantee, and to his wife, the daughter of the grantor. The sufficiency of the proof of a consideration must depend on the relations existing between the parties, the circumstances surrounding them when the transaction is entered into, and their subsequent conduct in reference to it. Clearer and more convincing proof will be required if there are circumstances calculated to excite a just suspicion of the fairness of the transaction. Transactions between parent and child are jealously watched in a court of equity, even when the controversy arises between them, and are sustained only when shown to be free from the taint of the influence of the relation. When it exists, and the rights of creditors are involved, clearer, fuller proof mut be given of an adequate and valuable consideration and of the good faith of the grantee or vendee, than would be required of a stranger.—*Hubbard v. Allen*, 59 Ala. 283.

2. The testimony fails to satisfactorily establish the alleged indebtedness from W. E. Perryman to his father. *Younger v. Massey*, 17 S. E. Rep. 711; *Lowry v. Pinson*, 2 Bailey 328; *Post v. Stiger*, 29 N. J. Eq. 554.

3. The proof shows without dispute that the vendees agreed to accept the goods at cost price and the notes and accounts at their face value. So that when goods and notes and accounts aggregating, at the agreed price, the sum of $13,090 had been inventoried, the parties should have stopped. After the indebtedness had been satisfied by a sufficient amount of goods, according to the price agreed on, there was no consideration to support any additional quantity and the willful taking of an excess invalidated the whole transaction. This has

[Henderson *et al.* v. Perryman *et al.*]

been twice solemnly decided by this court, in a case wherein the excess was very small, from $40 to $200. It made no difference that the excess. added to what was taken as payment, did not exceed the debt. The parties could agree on whatever they saw·fit, to pay the debt, and when that was done, further acceptance of property from the insolvent debtor was fraudulent, defeating the whole transaction.—*Rodenberg v. H. B. Claflin Co.*, 104 Ala. 560 ; *Claflin Co. v. Rodenberg*, 101 Ala. 213.

WILLIAM C. WARD, *contra.*—1. The proof in this case abundantly shows that William E. Perryman held the bonds and stocks of M. D. Perryman as a bailee, and that he converted these bonds and stocks without the knowledge of M. D. Perryman and without his subsequent assent. The fund arising from this conversion made at different times was mingled with his other funds or employed in the purchase and re-purchase of goods at various times, and that was substantially all the capital he had in his business. This gave M. D. Perryman the right to the property delivered to him.—*Standish v. Babcock*, 52 N. J. Eq. 628 ; *Myers v. Board of Education*, 37 Amer. St. Rep. 263 ; *McLeod v. Evans*, 66 Wis. 401, 57 Amer. Rep. 287 ; *Nat. Bank v. Ins. Co.*, 104 U. S. 54 ; *Smith v. Parker*, 49 N. J. Eq. 420 ; *Newton v. Porter*, 5 N. J.Law 428 ; *Lawrence v. Bank*, 3˙ Robertson 148 ; 2 Pom. Eq. Jur., 628.

2. The fact that it was a sale by son to father is not of much weight. "Relationship between vendor and vendee is not˙of itself indicative of fraud, and no clearer proof of *bona fides* of the parties is required than in other cases."—*Teague v. Lindsey*, 106 Ala. 266.

McCLELLAN, J.—This is a creditors' bill, filed by Henderson and others, in behalf of themselves and other creditors of W. E. Perryman & Co., against M. D. Perryman, W. E. Perryman, W. E. Perryman & Co. and the Alabama National Bank, to set aside as fraudulent a sale and transfer of certain personal property, consisting chiefly of a stock of merchandise and choses in action made by W. E. Perryman & Co. to M. D. Perryman and said bank, in alleged payment of debts alleged to be owing to said parties. The bill attacks this transaction upon the following grounds : 1st. That

said debts, and particularly that claimed to be due M. D. Perryman, were simulated. 2d. That the sale and transfer were in secret trust for the seller or sellers, W. E. Perryman or W. E. Perryman & Co. 3d. That in and by the sale a benefit was reserved to the seller. 4th. That the property sold and transferred in alleged payment of said debts was of materially greater value than the amount of said debts; and 5th. That W. E. Perryman & Co. was a partnership composed of W. E. Perryman and some other person or persons, that complainants were creditors of said partnership, and as such entitled to payment out of its assets in preference to individual creditors of W. E. Perryman, and that the debt of M. D. Perryman was an individual liability of W. E. Perryman, so that the transfer of partnership effects in payment of it was inoperative and void as against the partnership creditors. The answers denied all the material averments of the bill, and stated with adequate precision the facts in respect of the debts of M. D. Perryman and the bank, showing how and when they accrued or were incurred, their considerations, &c., &c.; that the property taken in payment of them was not of greater value than the amount of the debts; that "W. E. Perryman & Co." was the firm or business name under which W. E. Perryman alone carried on business; that he had no partner or partners; that the sale was made in good faith to pay real debts, and involved no secret trust or benefit reserved to the seller, &c., &c.

We have no difficulty on the evidence in reaching the conclusion that the debts of M. D. Perryman and the bank were real and just in the amounts claimed, and purporting to have been paid by the sale and transfer of the property. The testimony of M. D. Perryman and the officers of the bank is circumstantial, direct and positive to the establishment of their respective claims item by item, and they are corroborated by the testimony of W. E. Perryman; and while much might be said against the credibility of the last named witness, that of M. D. Perryman and the bank people is in no degree impeached or brought into serious question.

There is scarcely more difficulty in finding that the sale involved no secret trust in favor of, or reservation of benefit by the seller or sellers. The parties all disclaim it and deny it, swearing that nothing was involved

in the transaction except what appears upon the face of it—the sale and transfer of the property in absolute payment of honest debts—and that it was unaccompanied by any arrangement or understanding looking to the future well-being of W. E. Perryman. On this state of evidence, or against it, the inference sought to be drawn from the mere facts that W. E. Perryman continued to live with M. D. Perryman, his father, after the sale, as he had done before, and that M. D. Perryman, who was a man of fortune, and who, the whole evidence shows, had always been liberal to his sons, organized a corporation several months after the sale and employed W. E. Perryman as its secretary and treasurer at a very moderate salary, that all this was in consonance with an understanding constituting a part of the sale and transfer, is violent and unreasonable. Nothing was more natural and more probable than that such a man as M. D. Perryman appears from the whole tenor of the evidence to have been, should have made this or some like provision for putting his son again in the way of earning a livelihood, without the least extraneous constraint thereto; and we are utterly unable to conclude that what he thus did was done in consequence of an agreement or understanding so to do, entered into or had as a part of the transaction whereby the property of W. E. Perryman, or "W. E. Perryman & Co." was transferred to him in payment of his debt.

A more serious question arises when we come to consider whether the property transferred exceeded in value the aggregate of the debts purporting to be paid by the transfer. M. D. Perryman's debt was $10,470, and that of the bank was $2,620, the aggregate being $13,090. The answers deny the averments of the bill that the property was of materially greater value than this aggregate, and allege, to the contrary, that the goods, &c., turned over to M. D. Perryman and the bank "were not worth as much as they gave for them, and did not sell for enough to pay their respective demands." And the evidence supports these statements. But there was evidence going to show that the merchandise was to be taken at a certain per cent off of cost price and that the choses in action were to be taken at their face values; and the schedules of goods and choses in action, attached to the bill of sale, set forth

property item by item, and .opposite each item is the valuation put upon it according to what was said in the negotiation as to the prices or values at which the goods and choses · in action were to be taken. And the aggregate of these prices and values is about $1,200 in excess of the combined debts of M. D. Perryman and the bank. . M. D. Perryman undertakes to account for this discrepancy by swearing that his son owed him $1,200 or $1,500 which was not included in the $10,470 named in the bill of sale as his· debt. But he had previously sworn that all his son's indebtedness to him was included in the amount set down·in the bill of sale. Another attempted explanation is rested on the facts that the stock of goods transferred was in a rented house, that the rent for a month or so was in arrears and constituted a lien on the goods, that it was contemplated to continue the· use of the house in disposing of the merchandise, so that additional rent would have to be paid, and that there would be other expenses attending the disposition. of the property by the vendees, and therefore—to pay the rents accrued, and the rent and other expenses to be incurred—a larger amount of property was included in the sale than was necessary to pay the debts themselves. If the validity of the sale depended upon these supposed justifications of the discrepancy, it could not be allowed to stand. In the first place, nothing is clearer on the whole evidence than that W. E. Perryman did not owe his father this additional twelve or fifteen hundred dollars ; and if he ever did owe it, he owes it yet ; it was not paid by the sale in question. And as to the rent and other expenses incident, in the alleged contemplation of the parties, to a disposition of the property of the vendees, it would suffice to say that all that is accommodated and allowed for in the reduced valuation of the goods ; their sale in such a way as to incur such expenses would be at retail and retail prices—much in excess of the prices at which they went in bulk to M. D. Perryman and the bank. And as to the accrued rent : its amount is wholly insufficient to make up the discrepancy. And, moreover, it is clear from the bill of sale itself, as well as upon the whole evidence, that the sale was made in payment of the debts alone, and not to pay rents and other expenses, accrued or to accrue.

But we do not think the validity of the transaction depends upon the sufficiency of these attempted explanations of the fact that the property as valued in the schedules exceeded the debts. It is true that in the negotiation which led up to the sale, it was understood that the goods were to be taken at first cost with expenses of delivery in Birmingham added. The schedule of the goods attached to the bill of sale sets forth, as we have seen, this invoice cost against the several items as to the value at which they are taken in payment of the debts. And it is true the aggregate of these values, together with the aggregate of face values of the choses in action, is greater than the aggregate of the debts in payment of which the sale was made. But it is equally true that by the terms of the bill of sale, M. D. Perryman and the bank took the property named in the schedules in payment of their debts, no reference being made to the valuation of the items, and that the property thus taken, however it may have been valued in the negotiation and whatever the valuation stated in the schedules, was in point of fact not of a value greater than the amount of the debts. In other words, the purchasers got the property they bargained for and they paid an adequate consideration for it; and they got no more than they were entitled to take in satisfaction of the debts. And in the aspect most favorable to them, the most that can be said is, that they mistakenly supposed that they were receiving more than enough to satisfy their demands, and consequently more than they were entitled to receive. Granting this to be true, what is its effect upon the transaction? Certainly it is not an actual fraud upon other creditors, since they were entitled to take property of a value equal to their debts, and in point of fact took no more. Other creditors sustained no actual legal injury. The debtors' property went to pay as much of *bona fide* indebtedness as its real value admitted of; and when this is the case other creditors have no just grounds of complaint. But, it may be said, the preferred creditors were trying to get, and thought they were getting, more of the debtors' property than they were entitled to receive, and their purpose and intent must, therefore, have been to unlawfully hinder and delay, and to defraud other creditors. This may be conceded; but as they received no more

than they were entitled to receive, as none of the debtors' property went to them except in payment of an honest debt at a fair valuation—an appropriation which the law fully sanctions—the intent of the parties—sellers and purchasers—is wholly immaterial. However tainted with fraud and illegality their purposes may have been, their acts are not unlawful in themselves, nor do they entail any unlawful results to other creditors. At most they meant to take more than the law allows, but in point of fact they took only what the law authorizes, and no legal injury results to anybody. The case would be different, probably, if they had agreed to take certain property and had afterwards gone beyond the agreement and received additional property in the nature of a bonus. Here the bill of sale is the evidence of the final contract, and by it they took all the property scheduled. That property and none other, less or more, was the consideration for the cancellation of their debts, and its real value not being more than the debts, fraud cannot be predicated of the transaction.

This leaves for consideration only the inquiry whether "W. E. Perryman & Co." was a partnership, or W. E. Perryman individually doing business under a name appropriate to a partnership. That the business was carried on under the name of W. E. Perryman & Co. and that the debts of complainants were incurred and contracted in and by that name, is not questioned. The use of the words "& Co." following the name of "W. E. Perryman," is itself evidence that more than one person was engaged in the business, and raises a *prima facie* presumption of partnership, which, though weak it may be, requires some evidence to rebut, (1 Lindley on Partnership, p. 146, note ; Parsons on Partnership, § 98 ; 17 Am. & Eng. Encyc. of Law, p. 912 ; *B. L. & A. Co. v. Bank*, 100 Ala. 249) ; and in a proper case may become the basis of an estoppel on the person using such name to deny partnership.—*LeGrand v. Eufaula National Bank*, 81 Ala. 123.

The evidence in the abstract before us does not, in our opinion, rebut and overturn the presumption of partnership arising from the use of a name appropriate thereto, but, to the contrary, supports it. It is true that W. E. Perryman testifies that there was no partnership, no

other person in the business with him, and that it was his individual business carried on under the name of W. E. Perryman & Co. But this witness displays a readiness to testify to any thing or to forget every thing, as the occasion may seem to him to require, which to our minds destroys his credibility. His evidence throughout is self-contradictory. The number of facts of a nature to be even fresh in his memory which he does not remember, is marvelous. The number of things which would be known to any intelligent and honest witness situated in respect of them as he was, and which he yet does not know, surpasses comprehension. And his defects of knowledge and memory can not be ascribed in any instance to a want of intelligence. He flatly and without even attempted explanation contradicts himself, as the examination progresses, and to his mind, develops new situations which he feels called upon to deal with by putting forward a new state of facts. He is flatly contradicted by complainants' and respondents' witnesses alike, and even by his own father. So infirm, indeed, is his testimony that there could not be the least assurance of correctness in any conclusion of fact in the case favorable to the respondents based solely upon it. But aside from these general considerations going to impeach his testimony on the question of partnership, he is specially impeached in that particular connection by the testimony of two reputable and disinterested witnesses, who prove positive and deliberate declarations made by him to them, or in their presence, to the effect that "W. E. Perryman & Co." was a partnership composed of himself and M. D. and T. M. Perryman. It is not necessary, in support of the conclusions we have reached, to accord to this evidence any affirmative independent effect in the establishment of the fact of partnership. But it will quite serve the end in view to confine it, along with the other considerations to which we have adverted, to the office of destroying the last vestige of credibility that might otherwise have possibly attached to W. E. Perryman's testimony on this point. So far then, the issue is thus left to stand upon the presumption arising from the use of a firm name. What remains in the case bearing upon this issue, instead of rebutting, affirmatively supports this presumption. It may be conceded that M. D. Per-

ryman was not a partner. But he does not as a witness at all undertake to say that Travis (T. M.) Perryman was not a member of the firm. To the contrary he seems to have assumed that another person than W. E. was in the concern, and testifies: "I do not recollect of even asking the question as to who composed the firm of W. E. Perryman & Co. * * * My son Travis had been in the grocery business, and when I came here he was in or about to wind it up. To the best of my recollection, some of Travis' groceries went into the house of W. E. Perryman & Co., but how or when or how much I do not know." The bank officer who was examined as a witness testified to a want of knowledge as to whether Travis' connection with the business was as a partner or as an employé, though he knew that Travis was selling goods for W. E. Perryman & Co., and that he was engaged in and about the business. And the other evidence in the case shows the following facts in this connection: *First.* That Travis Perryman was in the grocery business before the business of W. E, Perryman & Co. was commenced. A part of his stock went into the business of Perryman & Co., and he ceased to do business separately from that concern when it started, but thereafter assisted in carrying on its business. W. E. Perryman says he bought out Travis, but his testimony as to what he paid him or how he paid is far from satisfactory in itself; and stripped of all credibility on considerations already adverted to. His theory is that after the business of W. E. Perryman & Co. was commenced, Travis clerked for them; but this sudden conversion of Travis from a partner and a principal into an employè and agent finds no explanation in the the testimony. *Second.* One Terman was a partner with Travis in the original business, and he continued as a partner for a time in the business of Perryman & Co., his interest therein being *one-third.* It is not unreasonable to suppose, in the absence of satisfactory evidence to the contrary, that Travis also continued as a partner; the remaining two-thirds interest being divided between him and W. E. Perryman. *Third.* No agreement was made as to the salary of Travis, although he continued throughout to work in the store of W. E. Perryman & Co., and though W. E. insists he paid him a salary, he is indefinite as to the amount of it, and can

42

not remember whether it forty or fifty, or more or less, dollars per month. *Fourth.* No credit was ever entered upon Travis' account for services, no settlement was ever made with him as an employé; but to the contrary his account stands open on the books of W. E. Perryman & Co. precisely as does the account of W. E. Perryman himself. *Fifth.* The expense account of W. E. Perryman & Co., while showing charges for salaries of other clerks, and charges for *travelling expenses* of Travis Perryman, contains no charge for any *salary* to Travis. And *sixth.* Respondents were fully advised of the issue of partnership *vel non* in the case, and its importance. The presumption of partnership stood against them. Their only witness to show that there was no partnership stood impeached by the sinuosities of his own testimony, and by the evidence of two credible witnesses. If there was no partnership, Travis Perryman could have proved the fact. He lived with his father, M. D. Perryman, and his brother, W. E. Perryman, and could have been readily brought to the stand. That he was not examined on this peculiar state of case is a circumstance tending to show that W. E. Perryman & Co. was a partnership. And upon all this we are driven to the conclusion that W. E. Perryman & Co. was a partnership.

It is insisted for the appellees, however, that whether Perryman & Co. was a partnership or W. E. Perryman only, is immaterial, for that in either event the transfer of property is valid because of the supposed fact that funds of M. D. Perryman, who alone occupies the position of a creditor of W. E. Perryman individually, held by W. E. Perryman in a fiduciary capacity, were converted by him into the property which was transferred to M. D. Perryman, so that such property, "in truth and in fact," as the answer alleges, "belonged to M. D. Perryman, and when he took the same in payment, he simply took his own property." Of the reasons which may exist for holding this line of defense untenable and unavailing, we need state one only: The evidence is not satisfactory to show, if indeed it even tends to show, that M. D. Perryman's funds were converted by W. E. Perryman into the property included in this bill of sale.

W. E. Perryman & Co. were insolvent and in failing circumstances when this transaction occurred. The sale

and transfer by W. E. Perryman in payment of his individual debt was a fraud upon complainants and other creditors of the firm. The decree dismissing the bill is reversed as to M. D. Perryman, but will be allowed to stand as to the bank; and a decree will be here rendered affirming the decree as to the bank, and reversing the decree and remanding the cause as to the other respondents.

Affirmed in part, and reversed and remanded.

HARALSON, J., not sitting.